# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **VIRGIE I. GIBSON,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:06cv00050 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand this case for further consideration of Gibson's mental impairments and their effect on her work-related abilities.

*I. Background and Standard of Review*

Plaintiff, Virgie I. Gibson, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

-1-

transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Gibson protectively filed her applications for SSI and DIB on or about January 2, 2003, alleging disability as of January 20, 1998, based on anxiety, depression, panic disorder, personality disorder and back and leg problems. (Record, ("R."), at 73-76, 85, 120.)[2] The claims were denied initially and on reconsideration. (R. at 56-58, 61, 63-65.) Gibson then requested a hearing before an ALJ. (R. at 66.) The ALJ held two hearings on July 6, 2004, and April 26, 2005, at which Gibson was represented by counsel. (R. at 435-78.)

---

[2]Gibson's SSI application is not contained in the record. The record shows that Gibson filed prior applications for SSI and DIB on February 2, 1998. (R. at 39.) The claims were denied initially and on reconsideration. (R. at 39.) By decision dated August 14, 1999, an administrative law judge, ("ALJ"), denied Gibson's claims. (R. at 39.) A request for review was filed, and the case was remanded to an ALJ for further proceedings. (R. at 39.) Subsequent hearings were held on October 23, 2002, and December 10, 2002. (R. at 39.) By decision dated December 19, 2002, the ALJ denied Gibson's claims. (R. at 39-46.)

-2-

By decision dated May 13, 2005, the ALJ denied Gibson's claims. (R. at 17-29.) The ALJ found that Gibson met the nondisability insured status requirements of the Act for DIB purposes through the date of the decision. (R. at 28.) The ALJ found that Gibson had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 28.) The ALJ found that the medical evidence established that Gibson had severe impairments, namely mild central canal stenosis of the cervical spine, back pain with history of sciatica, low average intellect and a depressive disorder, but he found that Gibson's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23, 28.) The ALJ also found that Gibson's allegations regarding her limitations were not totally credible. (R. at 28.) The ALJ found that Gibson retained the functional capacity to perform light work[3] that was not inconsistent with low average intelligence, that allowed a sit/stand option and that did not require climbing or work around alcoholic beverages. (R. at 28.) Thus, the ALJ found that Gibson could not perform her past relevant work. (R. at 28.) Based on Gibson's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Gibson could perform jobs existing in significant numbers in the national economy, including those of a laundry folder, a nonconstruction laborer, a cashier, a food checker, a parking lot attendant, a greeter, a hostess and a machine feeder. (R. at 28-29.) Therefore, the ALJ found that Gibson was not under a disability as defined in the Act, and that she was not eligible for benefits. (R. at 29.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2006).

---

[3]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2006).

After the ALJ issued his decision, Gibson pursued her administrative appeals, (R. at 12), but the Appeals Council denied her request for review. (R. at 6-9.) Gibson then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2006). The case is before this court on Gibson's motion for summary judgment filed January 8, 2007, and the Commissioner's motion for summary judgment filed January 19, 2007.

*II. Facts*

Gibson was born in 1970, (R. at 73, 438), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Gibson has an eighth-grade education and past work experience as a restaurant manager, a waitress and a sewing machine operator. (R. at 86, 91, 440.)

Thomas Schacht, Ph.D., a medical expert, testified at Gibson's hearing. (R. at 463-74.) Schacht testified that the record indicated that Gibson had a good response to treatment, despite noncompliance. (R. at 470.) He stated that Gibson should not work around alcoholic beverages because of her history of polysubstance dependence. (R. at 470.) Schacht further testified that testing performed by Edward E. Latham, Ph.D., a clinical psychologist, suggested that Gibson was malingering. (R. at 469, 472.) Schacht could not, however, state whether restrictions placed on Gibson by Latham were reasonable or not. (R. at 470.) All he would say was that the testing scores did not support the restrictions. (R. at 470-71.)

-4-

Cathy Sanders, a vocational expert, also was present and testified at Gibson's hearing. (R. at 474-78.) Sanders was asked to consider a hypothetical individual of Gibson's age and education, who had a low average intelligence and who had the residual functional capacity to perform light work that allowed a sit/stand option and did not require climbing or working around alcoholic beverages. (R. at 474.) Sanders testified that such an individual could perform work as a laundry folder, a nonconstruction laborer, a cashier, a food checker, a parking lot attendant, a greeter, a hostess, a machine feeder and a ticket clerk. (R. at 474.) Sanders stated that if the individual was seriously limited, but not precluded, in her ability to interact with supervisors, to deal with work stresses, to behave in an emotionally stable manner, to maintain attention/concentration and to understand and remember complex job instructions, there would be no jobs available that such an individual could perform. (R. at 476.)

In rendering his decision, the ALJ reviewed records from Wellmont Bristol Regional Medical Center; Dr. Nabil Ahmad, M.D.; Lee County Community Hospital; Scott County Rural Health Clinic; Lee County Counseling Center; Frontier Health; Stone Mountain Health Services; Bon Secours St. Mary's Family Center; Hugh Tenison, Ph.D., a state agency psychologist; Eugenie Hamilton, Ph.D., a state agency psychologist; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Richard M. Surrusco, M.D., a state agency physician; Stone Mountain Health Services; and Edward E. Latham, Ph.D., a clinical psychologist.[4]

---

[4]The ALJ's opinion also references a consultative psychological evaluation by Jorge F. Fuchs and B. Wayne Lanthorn, Ph.D., on April 26, 2002, (R. at 20), but there is no evidence of that evaluation contained in this record.

On August 14, 2000, Gibson was admitted to Wellmont Bristol Regional Medical Center for complaints of increased depression and suicidal thoughts. (R. at 135-39.) She reported that she had cut herself and wrecked her car in the past in an attempt to commit suicide. (R. at 137.) Gibson admitted that she occasionally consumed excessive amounts of alcoholic beverages. (R. at 138.) She was diagnosed with possible major depression, recurrent, and depressive disorder, not otherwise specified. (R. at 139.) Dr. Ashvin A. Patel, M.D., indicated that Gibson had a then-current Global Assessment of Functioning, ("GAF"), score of 30.[5] (R. at 139.) Gibson was given various medications, including Neurontin, Zoloft and Risperdal. (R. at 135.) She was discharged on August 25, 2000. (R. at 135-36.)

On May 22, 2001, Dr. Nabil Ahmad, M.D., discharged Gibson from his care due to Gibson's breach of contract. (R. at 140.) Gibson signed a narcotics contract indicating that she would not obtain narcotic medications from any other source. (R. at 140.) Dr. Ahmad reported that Gibson had received prescriptions for narcotics from other physicians. (R. at 140.)

On January 14, 2003, Gibson was admitted to Bon Secours St. Mary's Family Center for complaints of mood swings and depression with suicidal ideation. (R. at

---

[5]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 21-30 indicates that the individual's behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or an inability to function in almost all areas. *See* DSM-IV at 32.

-6-

242-46.) Upon admission, Gibson's GAF score was assessed at 40.[6] (R. at 245.) Gibson was discharged on January 24, 2003, with a diagnosis of bipolar disorder. (R. at 242.)

On May 1, 2002, Dr. Randall E. Pitone, M.D., a psychiatrist, saw Gibson for an initial psychiatric evaluation. (R. at 320-23.) He diagnosed major depressive disorder, single episode, moderate with history of suicide attempts, generalized anxiety disorder, possible panic disorder and alcohol dependence, in incomplete remission. (R. at 322.) Dr. Pitone assessed Gibson's then-current GAF score at 50-55.[7] (R. at 322.) On February 4, 2003, Dr. Pitone completed a mental assessment indicating that Gibson had a limited but satisfactory ability to follow work rules and to function independently. (R. at 234-36.) He indicated that Gibson had a seriously limited, but not precluded, ability to relate to co-workers, to use judgment, to interact with supervisors, to maintain attention/concentration, to understand, remember and carry out simple, complex and detailed instructions, to maintain personal appearance and to relate predictably in social situations (R. at 234-35.) Dr. Pitone indicated that Gibson had no useful ability to deal with the public, to deal with work stresses, to behave in an emotionally stable manner and to demonstrate reliability. (R. at 234-35.)

---

[6]A GAF of 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *See* DSM-IV at 32.

[7]A GAF of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32. A GAF of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

On July 15, 2003, Gibson reported that things were better and that her mood was more stable. (R. at 203.) Gibson showed no signs of psychosis, cognitive impairment, adverse effects of medication, misuse of medication or dangerousness to herself or others. (R. at 203.) On January 16, 2004, Dr. Zafar Ahsan, M.D., another psychiatrist, diagnosed bipolar disorder, mixed type, current episode depressed, and panic disorder without agoraphobia. (R. at 351-52.)

On March 17, 2003, Sharon Deel, R.N., a registered nurse for Lee County Counseling Center, completed a mental evaluation form for Disability Determination Services. (R. at 229-33.) Deel reported that Gibson was seen from April 16, 2002, through March 4, 2003. (R. at 229.) Gibson was diagnosed with major depressive disorder and panic disorder. (R. at 229.) Gibson reported that she used alcoholic beverages to self-medicate. (R. at 229.) Gibson reported that she had criminal charges pending against her for welfare fraud. (R. at 229.) Deel reported that Gibson's mood had improved drastically after her hospitalization. (R. at 231.) She reported that Gibson had mild anxiety and depression with congruent affect. (R. at 231.) Gibson reported a history of auditory and visual hallucinations. (R. at 231.) Deel reported that Gibson's memory and judgment were unimpaired. (R. at 231-32.) The record shows that Gibson participated in counseling through October 4, 2004. (R. at 277-359, 424-28.) On October 4, 2004, Deel reported that Gibson appeared to be doing fairly well on medication. (R. at 425.) Deel diagnosed major depression, in partial remission, panic disorder without agoraphobia and rule out bipolar disorder, mixed type. (R. at 425.)

On June 2, 2003, Hugh Tenison, Ph.D., a state agency psychologist, completed

-8-

Case 2:06-cv-00050-PMS   Document 20   Filed 04/25/07   Page 8 of 15   Pageid#: 76

a mental assessment indicating that Gibson was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting, to travel in unfamiliar places or use public transportation and to set realistic goals or make plans independently of others. (R. at 247-49.) This assessment was affirmed by Eugenie Hamilton, Ph.D., another state agency psychologist, on September 17, 2003. (R. at 249.)

Tenison also completed a Psychiatric Review Technique form, ("PRTF"), indicating that Gibson suffered from an affective disorder and an anxiety-related disorder. (R. at 255-68.) He indicated that Gibson had mild limitations in her ability to perform activities of daily living and moderate limitations in her ability to maintain social functioning and to maintain concentration, persistence or pace. (R. at 265.) Tenison also indicated that Gibson had experienced one or two episodes of decompensation. (R. at 265.) Tenison indicated that Gibson could perform simple, nonstressful work that did not require her to work around large numbers of people. (R.

at 267.)

On September 28, 2004, Edward E. Latham, Ph.D., a licensed clinical psychologist, evaluated Gibson at the request of Disability Determination Services. (R. at 405-09.) The Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), was administered, and Gibson obtained a verbal IQ score of 74, a performance IQ score of 81 and a full-scale IQ score of 76. (R. at 409.) Latham diagnosed bipolar disorder, not otherwise specified, and anxiety disorder, not otherwise specified, with panic and post-traumatic features. (R. at 408.)

Latham completed a mental assessment indicating that Gibson had a satisfactory ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to function independently, to maintain attention/concentration, to understand, remember and carry out detailed and simple instructions, to maintain personal appearance and to relate predictably in social situations. (R. at 411-13.) Latham indicated that Gibson had a seriously limited, but not precluded, ability to interact with supervisors, to deal with work stresses, to understand, remember and carry out complex instructions, to behave in an emotionally stable manner and to demonstrate reliability. (R. at 411-12.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process

requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated May 13, 2005, the ALJ denied Gibson's claims. (R. at 17-29.) The ALJ found that the medical evidence established that Gibson had severe impairments, namely mild central canal stenosis of the cervical spine, back pain with history of sciatica, low average intellect and a depressive disorder, but he found that Gibson's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23, 28.) The ALJ found that Gibson retained the functional capacity to perform light work that was

not inconsistent with low average intelligence, that allowed a sit/stand option and that did not require climbing or work around alcoholic beverages. (R. at 28.) Thus, the ALJ found that Gibson could not perform her past relevant work. (R. at 28.) Based on Gibson's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Gibson could perform jobs existing in significant numbers in the national economy, including those of a laundry folder, a nonconstruction laborer, a cashier, a food checker, a parking lot attendant, a greeter, a hostess and a machine feeder. (R. at 28-29.) Therefore, the ALJ found that Gibson was not under a disability as defined in the Act, and that she was not eligible for benefits. (R. at 29.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2006).

Gibson argues that the ALJ erred by failing to state the weight, if any, that he gave to Dr. Pitone's treatment records. (Memorandum In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-9.)

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

-12-

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

The ALJ found that the medical evidence established that Gibson had severe impairments, including low average intellect and a depressive disorder. (R. at 23, 28.) Thus, he found that Gibson retained the functional capacity to perform light work that was not inconsistent with low average intelligence, that allowed a sit/stand option and that did not require climbing or work around alcoholic beverages. (R. at 28.) Based on my review of the record, I do not find that substantial evidence supports the ALJ's finding with regard to Gibson's mental residual functional capacity.

The ALJ's opinion contains little analysis of the weight given to the psychological or psychiatric evidence. (R. at 27.) In fact, the ALJ does not give any reason for rejecting the opinions of Gibson's treating and evaluating psychologists and psychiatrist. (R. at 27.) Instead, the ALJ simply states, "the undersigned concludes that the claimant's allegations of a disabling mental impairment are not credible or supported by the overall medical evidence of record." (R. at 27.)

It appears that the ALJ relied upon the testimony of Schacht in determining that

-13-

Gibson was only prohibited from working around alcoholic beverages. (R. at 27.) The record, nevertheless, shows that Gibson was admitted for inpatient psychiatric treatment on at least two occasions for depression and suicidal ideation. (R. at 135-39, 242-46.) She was diagnosed with possible major depression, a depressive disorder and bipolar disorder. (R. at 139, 246.) Both Latham and Dr. Pitone diagnosed Gibson with bipolar disorder. (R. at 351-52, 408.) Latham and Dr. Pitone placed limitations on Gibson's ability to perform various work-related tasks. (R. at 234-35, 411-12.) Furthermore, state agency psychologist Tenison found that Gibson suffered from an affective disorder and an anxiety-related disorder. (R. at 255.) Tenison found that Gibson had moderate limitations in her ability to perform various work-related mental tasks. (R. at 247-48.) Tenison indicated that Gibson could perform simple, nonstressful work that did not require her to work around large numbers of people. (R. at 267.) Also, Schacht could not say that the restrictions placed on Gibson by Latham were unreasonable. (R. at 470-71.) While the ALJ is not bound to accept a medical source's opinion as to a claimant's residual functional capacity, he must consider any such opinion and explain what, if any, weight was given to it or why he chose to reject it. *See* 20 C.F.R. §§ 404.1546, 416.946 (2006); *see also King*, 615 F.2d at 1020. In this case, the ALJ offered no explanation of his weighing of the medical evidence on this issue. Thus, I cannot find that substantial evidence exists in the record to support the ALJ's rejection of the medical evidence or his finding with regard to Gibson's mental residual functional capacity.

*IV. Conclusion*

For the foregoing reasons, Gibson's and the Commissioner's motions for

-14-

Case 2:06-cv-00050-PMS   Document 20   Filed 04/25/07   Page 14 of 15   Pageid#: 82

summary judgment will be denied, and the court will vacate the Commissioner's decision denying benefits and remand this case to the Commissioner for further consideration of Gibson's mental impairments and their effect on her work-related abilities.

An appropriate order will be entered.

DATED: This 25th day of April 2007.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE